## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | | |
|---|---|---|
| DR. MICHELLE LOCKETT-LEWIS, | ) ) ) | |
| PLAINTIFF, | ) ) | |
| V. | ) ) | Civil Action No.:4:25-cv-000310-WMR |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA AND GEORGIA HIGHLANDS COLLEGE, | ) ) ) ) | JURY TRIAL DEMANDED |
| DEFENDANT. | | |

## [PROPOSED] PLAINTIFF DR. MICHELLE LOCKETT-LEWIS'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

### INTRODUCTION

1.     From the beginning of her employment with Defendant Georgia Highlands College and the Board of Regents of the University System of Georgia, Plaintiff, Dr. Michelle Lockett-Lewis, has always sought to do the right thing on behalf of the College and its students.

2.     Throughout her tenure as Assistant Vice President – Student Success and Dean of Students (and one of the only Black senior administrators), Dr. Lockett-Lewis advocated relentlessly on behalf of Defendant's student population.

3.     To do this, Dr. Lockett-Lewis repeatedly spoke truth to power within the College, including when she raised significant, substantial concerns of 1)

misappropriation of funding for student-athlete housing, 2) credible allegations of sexual assault when on school sanctioned fields trips, 3) misconduct within the College softball team, 4) misconduct from both the Men's and Women's basketball coaches, 5) theft of financial aid funding, 6) violations of NJCAA housing policies by sub-renting to current students, and 7) violations of the Georgia Fair Employment Practices Act and Titles VII and IX of the Civil Rights Act of 1964.

4.      Rather than thanking Dr. Lockett-Lewis for her tireless advocacy in defense of the student population, Georgia Highlands College and the Board of Regents of the University System of Georgia unlawfully retaliated against her by, among other things, placing Dr. Lockett-Lewis on administrative suspension beginning March 27, 2025 (which remains ongoing), launching a coordinated and malicious smear campaign inclusive of a retaliatory investigation, submitting false documents to a federal agency to besmirch her character, and ultimately terminating her employment.

5.      Dr. Lockett-Lewis, however, remains unbowed. This lawsuit for injunctive relief and damages stemming from violations of the Georgia Whistleblower Act, the Georgia Fair Employment Practices Act, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. Section 1981 follows.

## PARTIES, JURISDICTION, AND VENUE

6.      Dr. Michelle Lockett-Lewis, Assistant Vice President – former Student Success and Dean of Students, is a Black woman and a resident of Georgia, who submits herself to the jurisdiction of this Court.

7.      Defendant Georgia Highlands College and the Board of Regents of the University System of Georgia are public entities. Under O.C.G.A. 9-11-4(e)(5), therefore, service of process upon Defendant may be accomplished by serving the summons and a copy of this Complaint upon the Chancellor of the Board of Regents and the Attorney General of Georgia.

8.      More specifically, Defendant may be served through Dr. Sonny Perdue, Chancellor, or one of his designees in the legal department, at 270 Washington Street, SW, Atlanta, Georgia 30334.

9.      The Attorney General of Georgia, moreover, may be served through Chris Carr or one of his designees at 40 Capitol Square, SW, Atlanta, Georgia 30334.

10.     Dr. Lockett-Lewis's claims present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

11.      This Court also has supplemental jurisdiction over Dr. Lockett-Lewis's state law claims pursuant to 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as her federal claims.

3

12.     Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3) and Local Rule 3.1(B)(3), venue is proper because the unlawful practices giving rise to Dr. Lockett-Lewis's claims occurred in this judicial district and division.

## ADMINISTRATIVE PREREQUISITES HAVE BEEN SATISFIED

13.     Dr. Lockett-Lewis has satisfied all administrative prerequisites to perfect her federal claims under Title VII.

14.     To that end, Dr. Lockett-Lewis filed Charges 1) Michelle Lockett-Lewis v. Georgia Highlands College, et al., EEOC Charge No. 410-2025-14332; 2) Dr. Michelle Lockett-Lewis v. Georgia Highlands College and Board of Regents of the University of Georgia, et al., EEOC Charge No. 410-2025-08544; and 3) Michelle Lockett-Harmer v. Georgia Highlands College and Board of Regents of the University System of Georgia, et al., EEOC Charge No. 410-2026-05188.

15.     Notably, the EEOC found Cause with respect to Charge No. 410-2025-08544 that discrimination and retaliation had occurred and sought conciliation, which Defendants rejected. The EEOC then referred the matter to the U.S. Department of Justice.

16.     Right to Sue Notices have been issued with respect to both Charges of Discrimination. The original Complaint was filed within 90 days of the issuance of the Right to Sue Notices for Charge Nos. 410-2025-14332 and  410-2025-08544.

17.    This Amended Complaint, moreover, has been filed within 90 days of the issuance of the Right to Sue notice for Charge No. 410-2026-05188.

**DR. LOCKETT-LEWIS IS FORCED TO SIT THROUGH MULTIPLE ROUNDS OF INTERVIEWS WHILE WHITE EMPLOYEES WERE HAND-PICKED, THEN IS HIRED AS GHC'S FIRST BLACK ASSISTANT VICE PRESIDENT-STUDENT SUCCESS AND DEAN OF STUDENTS**

18.    Dr. Lockett-Lewis, the only Black woman with a senior leadership role at Georgia Highlands College during her tenure, was forced to sit through multiple rounds of interviews and conduct a presentation before the entire Campus before the College ultimately chose to hire her in July 1, 2021, as Assistant Vice President – Student Success and Dean of Students.

19.    All other leaders hired or promoted at or near in time to her – inclusive of David Van Hook (Assistant Vice President), Julius Fleschner (Assistant Vice Provost), and Lisa Jellum (Assistant Vice Provost) – were hand-selected for their roles. None of them were interviewed at all, much less three times (as Dr. Lockett-Lewis was). Nor did any of them have to conduct a Campus-wide presentation prior to their selections, as Dr. Lockett-Lewis did. And each of them happens to be White.

20.    Based on this disparate treatment, several ethics complaints were ultimately submitted to the University System of Georgia ethics compliance line. USG, in response, prepared an internal memorandum outlining the steps GHC was

required to follow before hiring a Vice President or other member of senior

leadership.

### DR. LOCKETT-LEWIS RESCUES WOMEN'S BASKETBALL TEAM PLAYERS FROM DERELICT HOUSING AND REPORTS ALARMING MISCONDUCT, TO NO AVAIL

21.     As part of her work, Dr. Lockett-Lewis advocated relentlessly that

Defendant's students be treated equitably (and humanely).

22.     For instance, in Academic year 2023, members of the Women's

Basketball Team reached out to Dr. Lockett-Lewis for help because the house they

were living in was freezing cold; the heat had stopped working. Dr. Lockett-Lewis

and Dr. Coakley drove over to the house with all haste. What they found was

shocking.

23.     The house was dilapidated, with broken windows, mold, and water

damage throughout. Worse, the heat was broken (in the dead of winter) and the

Women's Basketball team members living there were freezing.

24.     Dr. Lockett-Lewis and Dr. Coakley instructed the players to pack their

things immediately and moved the players into a hotel that very night.

25.     Ultimately, the players were moved into alternative housing for the

remainder of the semester.

26.     Thereafter, an investigation was conducted, and it was determined that

Brandon Harrell, GHC's then-Athletic Director, maintained an undisclosed

ownership interest in the dilapidated house and was profiting from rent collections from the players, in violation of GHC and NJCAA policy.

27.    On information and belief, Mr. Harrell was not disciplined in any way despite endangering students and violating policies.

28.    Also on information and belief, no disclosure was made to the NJCAA regarding Mr. Harrell's inappropriate ownership interest in the home.

29.    After the players were moved out of the dilapidated home owned by the then-Athletic Director, further startling and alarming allegations surfaced.

30.    For instance, on or about March 18, 2023, members of the Women's Basketball Team reported to Dr. Lockett-Lewis that Briana Brooks, Women's Basketball Head Coach, had twice brandished a firearm when in close proximity to team members. It was further alleged that Coach Brooks solicited and collected rent payments from players in cash, and that at least some of that money allocated for rent payments was spent on frivolities for Coach Brooks.

31.    In addition, on information and belief, it is further understood that Coach Brooks forced players to engage in work under the guise of "fundraising." As part of this "fundraising," players were required to staff Georgia Tech sporting events and put on car washes, among other unsanctioned activities. Coach Brooks would then take that money to supplement her income.

32.    Even though Dr. Lockett-Lewis reported this ongoing and dangerous misconduct, nothing was done.

## DR. LOCKETT-LEWIS REPORTS SEXUAL MISCONDUCT BY FACULTY AND STAFF AT GHC AND NOTHING IS DONE

33.    The rampant misconduct was not limited to the Women's Basketball team and the Athletic Director, unfortunately.

34.    Indeed, on or about July 9, 2024, Dr. Lockett-Lewis submitted an investigative report wherein she concluded that Jeff Brown, a photographer in GHC's marketing department who's in his 50s or 60s, had inappropriately invited a student to his home, where he touched her without her consent and pressured her to stay until approximately 3:30 a.m. Such conduct violates GHC's policies and Title IX of the Education Amendments of 1972.

35.    On information and belief, Mr. Brown was not coached, counseled, warned, or otherwise disciplined based on this inappropriate, harmful, and potentially unlawful behavior. Worse still, when Dr. Lockett-Lewis protested that it was inappropriate for Mr. Brown to attend a GHC trip to Wyoming with students because of the substantiated accusations of sexual misconduct, GHC administrators became upset with her, rather than him.

36.    On information and belief, moreover, GHC, as a government contractor receiving federal funds, represents at regular intervals that it remains in compliance with Title IX of the Education Amendments of 1972.

37.    Assuming this is true, this means that GHC has been misrepresenting its compliance with Title IX for an extended period of time, which will likely interest the U.S. Department of Justice.

38.    On or about August 27, 2024, Dr. Lockett-Lewis reported to Dr. Coakley and Ms. Itkow that Tucker Hughes, then-Softball Coach, failed to report credible allegations that a former softball player on the team had been raped by a member of the Men's Baseball Team. Mr. Hughes, as a mandated reporter, was required to pass these allegations along to pertinent officials, including members of the Athletic Department and the local police.

39.    Mr. Hughes' failure to report these credible allegations of rape is also a violation of Title IX of the Education Amendments of 1972, and likewise violates GHC policy.

40.    On information and belief, nothing was done in response to this report. Nor was any disciplinary action taken against Mr. Hughes despite Dr. Lockett-Lewis also reporting to GHC that Mr. Hughes had also supplied ZYN tobacco pouches to his athletes, in violation of GHC and NJCAA policy, as well as Georgia state law.

**DR. LOCKETT-LEWIS REPORTS ALLEGATIONS OF SEXUAL HARASSMENT BY DEAN JESSICA LINDBERG AGAINST THE CHAIR OF THE HUMANITIES DEPARTMENT**

41.    In addition to advocating for students and seeking to hold an out-of-control Athletic Department to account, Dr. Lockett-Lewis also tirelessly spoke out on behalf of aggrieved faculty.

42.    For example, around October 9, 2024, Danielle Swanson, Division Chair of the Humanities Department and Assistant Professor, reached out to Dr. Lockett-Lewis to discuss concerns relating to Dean Jessica Lindberg, Head of the Humanities Department and Ms. Swanson's direct supervisor.

43.    In the course of their conversation, Ms. Swanson shared that during the 2023 Presidential Gala, Dean Lindberg had inappropriately directed her to sleep with then-newly appointed GHC President Mike Hobbs for the benefit of the Humanities Department.

44.    Ms. Swanson further explained that Dean Lindberg's instruction, along with some other inappropriate behaviors – like Dean Lindberg's denial of Ms. Swanson's FMLA request – was negatively impacting her mental health.

45.    As the conversation concluded, Dr. Lockett-Lewis explained to Ms. Swanson that she felt obligated to report Dean Lindberg's comments to the GHC human resources team because she is a mandated reporter and spearheads GHC's Title IX compliance efforts.

46.     Thereafter, in or around early November 2024, Dr. Lockett-Lewis met with Dana Itkow, Chief Human Resources Officer, to report Dean Lindberg's instruction to Ms. Swanson to have sex with GHC President Mike Hobbs.

47.     Ms. Itkow, a seasoned HR executive with more than twenty years of experience, did not do anything that an HR executive in her position and with her experience would normally do. She did not interview Ms. Swanson, did not collect any evidence, and did not otherwise conduct any sort of investigation whatsoever.

48.     Instead, Ms. Itkow chose to convene a meeting between herself, Dean Lindberg, and Ms. Swanson. Ms. Swanson, in turn, invited Dr. Lockett-Lewis to attend as a witness.

49.     The contemplated meeting between Ms. Swanson and Dean Lindberg, with Ms. Itkow as moderator and Dr. Lockett-Lewis as an "observer" took place on December 3, 2024. Ms. Itkow, Ms. Swanson, and Dean Lindberg attended in person, while Dr. Lockett-Lewis attended virtually.

50.     Without any advance warning to Ms. Swanson, Ms. Itkow began the meeting by forcing Ms. Swanson to read out a written summary of her accusations against Dean Lindberg, with Dean Lindberg sitting right next to her.

51.     After Ms. Swanson concluded reading her statement about how Dean Lindberg 1) instructed her to have sex with President Hobbs to benefit the Humanities Department; and 2) unlawfully and inappropriately denied Ms.

Swanson's request for leave without even mentioning the FMLA, as she was required by law to do, Ms. Itkow asked Dean Lindberg to respond to what she'd heard.

52.    Dean Lindberg, tellingly, did not deny any of Ms. Swanson's narrative. In fact, Dean Lindberg admitted that she denied Ms. Swanson's request for leave, which was not only against GHC policy, but patently unlawful. Rather than doing anything to rectify that situation or otherwise educate Dean Lindberg on her responsibilities under the law, Ms. Itkow merely chided her not to do that again.

53.    As for her comment that Ms. Swanson should have sex with President Hobbs to help out the Humanities Department, Dean Lindberg pretended that she couldn't remember what had occurred and refused outright to accept any responsibility for what she'd said or how it made Ms. Swanson feel. Rather, Dean Lindberg insisted blithely that Ms. Swanson misinterpreted what she'd said, which was of course false.

54.    The meeting mercifully ended not long thereafter. No further investigation was performed, even though GHC's typical practice was to launch an inquiry, in conformance with its obligations under Title IX of the Education Amendments of 1972.

55.     On December 10, 2024, as further recognition of her outstanding achievements in assisting students at the College, Dr. Lockett-Lewis was awarded the  Embark Georgia Mini-Grant for the Spring 2025 academic semester. To that end, GHC was awarded $48,220.00 to fund a groundbreaking initiative to support students facing homelessness, and food or housing insecurities.

**DR. LOCKETT-LEWIS RAISES CONCERNS OF RACE-BASED DISCRIMINATION TO DANA ITKOW, GHC'S CHIEF HUMAN RESOURCES OFFICER, AND NOTHING IS DONE**

56.     Also on December 10, 2025, by text message to Ms. Itkow, Dr. Lockett-Lewis reported that she'd been experiencing ongoing mistreatment at the hands of GHC, including the College's failure to provide her department with an appropriate budget, as well as disrespect from administrators, and exclusion from critical meetings.

57.     This report was not the first time Dr. Lockett-Lewis raised concerns of disparate treatment. For instance, Dr. Lockett-Lewis repeatedly sought information regarding why Ms. Jellum and Stephanie Loveless (Assistant Vice President), who are both White, were paid more than she was for doing the same work.

58.     Dr. Lockett-Lewis further pointed out that Mr. Fleschner was provided a stipend by the College for finalizing its accreditation submission. Despite also performing significant work on the same accreditation submission, Dr. Lockett-Lewis did not receive a similar stipend (or any additional payment or recognition).

59.    On information and belief, Ms. Itkow did not investigate or otherwise substantively respond to these concerns in any way, despite her role as Chief Human Resources Officer.

## DR. LOCKETT-LEWIS REPORTS ADDITIONAL MALFEASANCE AND POLICY VIOLATIONS WITHIN THE ATHLETIC DEPARTMENT AND NOTHING IS DONE

60.    On January 20, 2025, Dr. Lockett-Lewis reported to Ms. Itkow and Dr. Coakley, copying President Hobbs, that Mr. Hughes (former softball coach) had been texting softball team players despite the fact that he no longer worked for the College. Dr. Lockett-Lewis further advised Dr. Nicole Levering, the Athletic Director, that it would be prudent to pursue a no-contact order.

61.    On information and belief, nothing was done in response to this report.

62.    On January 27, 2025, Dr. Lockett-Lewis submitted a preliminary report to Dr. Coakley, Ms. Itkow, and Ms. Levering, wherein she outlined her findings that Jonathan Merritt and John Williams, Men's Basketball Team Head Coaches, improperly collected rent money directly from players on the Men's basketball team, in violation of NJCAA bylaws and GHC policy.

63.    This report was particularly problematic because 1) GHC administrators had previously warned Coach Merritt and others that GHC did not provide student housing for its athletes; and 2) the findings indicated that Coach

Merritt was personally collecting various cash amounts, some of which evidently went to rent payments, while other amounts remain unaccounted for.

64.    Worse still, Dr. Lockett-Lewis, as a member of the Clery Committee, had also previously voiced her fears regarding unsanctioned housing previously to Police Chief Horace and Ms. Itkow. Nothing was done in response to those reports. Rather, GHC turned a blind eye for years until Dr. Lockett-Lewis forced the issue.

**DR. LOCKETT-LEWIS ESCALATES CONCERNS OF DISPARATE TREATMENT AND BEGINS TO EXPERIENCE RETALIATION FROM PRESIDENT MIKE HOBBS, DR. COAKLEY, MS. ITKOW, AND OTHER GHC PERSONNEL**

65.    Around this same time, by email sent to Dr. Coakley sent in January 2025, Dr. Lockett-Lewis reported a slew of concerns she'd been harboring. Many of these concerns had been reported previously, with little to no response from GHC, so Dr. Lockett-Lewis felt she had no choice but to continue to escalate her complaints.

66.    Among those concerns were allegations of disparate treatment, including failure to fully fund Dr. Lockett-Lewis's budget requests. Dr. Lockett-Lewis likewise expressed concern that other White administrators at her level, including Lisa Jellum and Stephane Loveless, were paid more than her, and that the differential in compensation was race-based.

67.    Dr. Coakley, in response, set up a meeting between Dr. Lockett-Lewis, Ms. Itkow, President Hobbs, and herself to discuss Dr. Lockett-Lewis's allegations

of disparate treatment. That meeting, which took place on February 5, 2025, was in ambush in all but name.

68.    During the meeting, President Hobbs questioned Dr. Lockett-Lewis' performance and her integrity, ridiculed her concern for students as overly emotional, and expressed anger towards her because she didn't let him know about Ms. Swanson's complaint regarding Dean Lindberg's suggestion that Ms. Swanson have sex with him for the benefit of the Humanities Department. For reasons that remain unclear, and despite having no need to know of Ms. Swanson's allegations that related to Dean Lindberg, President Hobbs expected to be looped in to Ms. Swanson's harassment and retaliation complaint (and was really mad that he wasn't).

69.    Stranger still, when accusing Dr. Lockett-Lewis of being overly emotional when responding to concerns regarding misconduct against students, President Hobbs asked Dr. Lockett-Lewis whether she believes individuals can be "rehabilitated." Dr. Lockett-Lewis responded that individuals who engage in sexual misconduct with students do not belong in academia.

70.    Before the meeting concluded, President Hobbs 1) made light of the prior Athletic Director's decision to house the Women's Basketball Team in derelict, condemned housing; and 2) expressed frustration that Dr. Lockett-Lewis'

investigation regarding the Men's Basketball Coach's rent-collecting scheme would likely result in the Coach's termination.

71.    Rather than showing compassion for the impacted student-athletes and expressing alarm at the misfeasance and malfeasance within the Athletic Department – which could indeed jeopardize the College's NJCAA standing – the President instead directed his ire towards Dr. Lockett-Lewis who was, once again, only trying to protect the students she serves.

**DR. LOCKETT-LEWIS SUBMITS A COMPLAINT TO THE UNIVERSITY SYSTEM OF GEORGIA BASED ON GHC'S DISPARATE TREATMENT OF HER AND PRESIDENT HOBBS' RETALIATORY MISCONDUCT, THEN FILES THE FIRST CHARGE OF DISCRIMINATION**

72.    After the meeting concluded, by email to Quint Hill, Associate Vice Chancellor, Human Resources and Wesley Horne Assistant Vice Chancellor, Ethics and Compliance dated February 5, 2025, Dr. Lockett-Lewis submitted a formal grievance to the University System of Georgia. In that grievance, Dr. Lockett-Lewis reported how President Hobbs was dismissive, rude, and condescending during the meeting earlier that day, and further explained how he'd minimized the significant compliance issues stemming from the Athletic Department. Dr. Lockett-Lewis also expressed that she felt she'd been subject to disparate treatment and a hostile work environment.

73.    Approximately three weeks later, after having heard nothing at all from Mr. Horne, Ms. Hill, or anyone at all at the University System of Georgia

regarding her formal grievance, on February 24, 2025, Dr. Lockett-Lewis filed her first Charge of Discrimination with the Equal Employment Opportunity Commission and the Georgia Commission on Equal Opportunity. In the first Charge, styled Charge No. 410-2025-05741, Dr. Lockett-Lewis averred that GHC had discriminated and retaliated against her based on her race and color by, among other things, refusing to adequately investigate her internal grievance and denying her department necessary funding.

74.     A few days later, by follow-up email to Ms. Hill and Mr. Horne dated February 28, 2025, Dr. Lockett-Lewis submitted a second formal complaint against GHC and President Hobbs, alleging disparate treatment, biased actions, and harassment.

75.     In that complaint, which was sent because Dr. Lockett-Lewis had heard nothing regarding her internal complaint from nearly a month prior, Dr. Lockett-Lewis alleged that President Hobbs became angry with her because she failed to report Ms. Swanson's concerns regarding Dean Lindberg to him. Evidently, President Hobbs believed that because Dean Lindberg pressured Ms. Swanson to sleep with President Hobbs for the benefit of the Humanities Department, Dr. Lockett-Lewis should have reported the same to him directly.

76.     Dr. Lockett-Lewis also reiterated her ongoing concerns relating to the Women's and Men's Basketballs teams that she had reported, as well as those

relating to the Women's Softball team. These allegations, as explained above, related to misuse of federal funds, unlawful housing arrangements, misfeasance relating to financial aid distribution, the brandishing of deadly weapons, and other violations of GHC policy.

### GHC PLACES DR. LOCKETT-LEWIS ON AN INDEFINITE ADMINISTRATIVE LEAVE TO RETALIATE AGAINST HER FOR FILING COMPLAINTS AGAINST PRESIDENT HOBBS AND GHC

77.    Despite having already filed two separate complaints with USG dated February 5 and 28, 2025, and also filing the first Charge of Discrimination with the GCEO and EEOC alleging violations of state and federal law, no one at GHC felt any need at all to reach out to Dr. Lockett-Lewis to investigate her concerns in any way.

78.    Rather, the next thing Dr. Lockett-Lewis knew, she'd been placed on administrative leave "until further notice."

79.    Indeed, on March 27, 2025, Dr. Lockett-Lewis was summoned to a meeting with Dr. Coakley and Damaris Mendoza, during which Dr. Lockett-Lewis was told she had been placed on administrative leave with immediate effect *because of complaints that had been made about her*.

80.    Given no concerns had been raised to Dr. Lockett-Lewis regarding her own conduct, this suspension came as a total surprise (and reeked of retaliation). This is particularly the case given that a credible allegation of sexual harassment

was raised against Dean Lindberg and nothing was done, apart from Ms. Itkow convening an ill-advised meeting between the accuser and the accused to "clear the air."

81.    After the meeting concluded, Dr. Lockett-Lewis was escorted to her vehicle by Police Chief Horace, who was there at the behest of GHC. Evidently, GHC viewed Dr. Lockett-Lewis as the stereotypical "angry Black woman" and was concerned she'd make a scene or become violent, which of course was not the case. In fact, Chief Horace casually locked elbows with Dr. Lockett-Lewis and joked with her while walking her to her car, shaking his head at the absurdity of the situation.

82.    That same day, by letter dated March 27, 2025, Dr. Lockett-Lewis was directed not to step foot on any GHC campus or contact any of her twelve direct reports. Dr. Lockett-Lewis was further directed not to perform any work at all, which meant that she'd been stripped of her regular duties and her teaching duties.

83.    On information and belief, no communication was made to any of Dr. Lockett-Lewis' students regarding why their professor had been placed on leave effective immediately.

84.    Dr. Lockett-Lewis immediately requested clarification regarding why she'd been suspended pending an investigation into her conduct, as she'd never

been made aware of any concerns before she filed her two complaints with USG and her first Charge of Discrimination.

85.    Several days later, by letter dated April 1, 2025, Ms. Itkow wrote that Dr. Lockett-Lewis had been placed on administrative leave because several unnamed individuals purportedly raised unspecified complaints at unidentified times regarding Dr. Lockett-Lewis's behavior at work. For that reason, and to allow GHC to investigate both Dr. Lockett-Lewis's allegations and the purported allegations that had been raised against her, GHC made the decision to suspend her until further notice.

## GHC PURPORTS TO INVESTIGATE DR. LOCKETT-LEWIS'S ALLEGATIONS, BUT ULTIMATELY REFUSES TO TAKE THEM SERIOUSLY

86.    GHC's "investigation" into Dr. Lockett-Lewis's concerns kicked off the following week. On or about April 4, 2025, Ms. Hill and Mr. Horne reached out to Dr. Lockett-Lewis to schedule an investigatory interview with her. That meeting was ultimately set for April 14, 2025.

87.    On April 14, 2025, Dr. Lockett-Lewis attended a virtual meeting with Ms. Hill and Mr. Horne. During the meeting, Dr. Lockett-Lewis reiterated the concerns she'd raised previously regarding disparate treatment, as well as her ongoing concerns relating to Women's and Men's Basketball and the Women's Softball team. These allegations, as explained above, related to misuse of federal

funds, unlawful housing arrangements, misfeasance relating to financial aid

distribution, the brandishing of deadly weapons in the presence of students on

multiple occasions, and other violations of GHC policy.

88.     Two days later, by email dated April 16, 2025, Dr. Lockett-Lewis

submitted additional text messages to Ms. Hill and Mr. Horne that evidenced GHC

directing Dr. Lockett-Lewis to stop investigating the Men's Basketball team, along

with threatening text messages that President Hobbs sent her.

89.     Less than two weeks after that, on April 28, 2025, Dr. Lockett-Lewis

submitted a supplemental position statement to the EEOC in support of Charge No.

410-2025-05741. In that rebuttal, Dr. Lockett-Lewis explained that GHC had

retaliated against her again by removing her from her teaching role and placing her

on administrative leave until further notice. Dr. Lockett-Lewis committed to filing

a new Charge of Discrimination as well.

90.     Later on April 28, 2025, Dr. Lockett-Lewis filed Charge No. 410-

2025-08544, alleging retaliation against GHC based on, among other actions, the

College's decision to suspend her.

91.     Additional retaliatory actions from GHC followed swiftly. Indeed,

despite being the only African American Assistant Vice President in the more than

70-year history of the College, GHC refused to allow Dr. Lockett-Lewis to

participate in commencement. This was particularly painful (and mean-spirited) given her role as Dean of Students.

92.     Worse still, GHC refused to allow Dr. Lockett-Lewis the opportunity to teach summer and fall courses, which she'd planned to do. This robbed Dr. Lockett-Lewis of the opportunity to make additional income.

93.     On May 23, 2025, Ms. Hill and Mr. Horne distributed USG's preliminary report regarding Dr. Lockett-Lewis's allegations. Disappointingly, the report did not address any of the athletics-related issues Dr. Lockett-Lewis had raised for more than a year. Nor did the report seriously examine the retaliatory actions taken by the President against her (or Dean Lindberg against Danielle Swanson).

94.     Given Ms. Hill and Mr. Horne's failure or refusal to address Dr. Lockett-Lewis's concerns head-on, by letter dated June 27, 2025, Dr. Lockett-Lewis filed a formal rebuttal to the preliminary report. In the rebuttal, Dr. Lockett-Lewis explained, again, that she had experienced retaliation for raising concerns of disparate treatment, as well as for protecting student athletes while holding the Athletic Department to account, and for standing up against Dean Lindberg's retaliatory demotion of Professor Swanson.

95.     Approximately three weeks later, by letter dated July 18, 2025, Ms. Hill and Mr. Horne sent over USG's final investigative report. That report, like the

preliminary report, suffered from serious deficiencies, including a complete failure to address Dr. Lockett-Lewis's concerns of retaliation for reporting misconduct within athletics and by Dean Lindberg.

**THE EEOC FINDS CAUSE TO BELIEVE THAT GHC DISCRIMINATED AND RETALIATED AGAINST DR. LOCKETT-LEWIS, IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, SO GHC KICKS OFF A RETALIATORY INVESTIGATION AGAINST HER**

96.    On or about August 5, 2025, the Equal Employment Opportunity Commission informed Dr. Lockett-Lewis that it had found cause to be believe that discrimination had occurred with respect to Charge No. 410-2025-08544. More specifically, the Commission determined that Dr. Lockett-Lewis was placed on administrative leave in retaliation for raising protected complaints.

97.    Two days after the EEOC found cause, by letter dated August 7, 2025, GHC purported to explain to Dr. Lockett-Lewis, *for the very first time*, why she'd been placed on administrative leave six months earlier, in March 2025.

98.    In that letter, GHC purported to outline alleged ticky-tack violations of GHC policy, inclusive of failure to adhere to remote work guidelines.

99.    Based on this phony investigation, on August 25, 2025, Dr. Lockett-Lewis filed yet another Charge with the EEOC, styled Charge No. 410-2025-14332. Therein, Dr. Lockett-Lewis alleged that GHC had spun up a baseless investigation to retaliate against her for raising protected concerns.

100.   About a week later, on September 3, 2025, Dr. Lockett-Lewis was interviewed by Orie Thornton in furtherance of GHC's "investigation" into Dr. Lockett-Lewis's purported conduct.

101.   During that interview, Ms. Thornton accused Dr. Lockett-Lewis of asking a subordinate to run errands for her, and further accused Dr. Lockett-Lewis of micromanaging some of her team. Dr. Lockett-Lewis denied those allegations and requested to review any evidence that might support them. Tellingly, none has been provided.

## MS. ITKOW SUBMITS A FABRICATED DOCUMENT TO THE EEOC AND IS NOT DISCIPLINED DESPITE LYING TO A FEDERAL AGENCY

102.   About two weeks after that, on September 19, 2025, GHC submitted a false document to the EEOC in support of the College's position statement responding to Charge No. 410-2025-14332. More specifically, in the position statement, the College purported to attach a letter that Ms. Itkow represented she'd sent to Dr. Lockett-Lewis on March 28, 2025. This letter was a fabrication; it was never sent.

103.   Dr. Lockett-Lewis informed the Commission of Ms. Itkow's lie and the falsity of the letter forthwith.

104.   In addition, Dr. Lockett-Lewis sent the false letter to USG on September 23, 2025, and specifically accused Ms. Itkow of falsifying an official

document. Despite bringing Ms. Itkow's lie to GHC's attention, nothing has been done.

105.   On or about September 24, 2025, Dr. Lockett-Lewis received the right to sue notice for Charge No. 410-2025-14332.

## GHC CONCLUDES ITS RETALIATORY "INVESTIGATION" AND RECOMMENDS THAT DR. LOCKETT-LEWIS BE DISCIPLINED FOR PURPORTED MISCONDUCT THAT PALES IN COMPARISON TO THAT OF OTHER FACULTY

106.   On October 16, 2025, Ms. Thornton finally published her purported "investigative report." In the course of her "investigation," Ms. Thornton purported to interview four of Dr. Lockett-Lewis's twelve direct reports, and cherry-picked a smattering of ticky-tack actions that do not amount to violations of either policy or law to support her conclusion that GHC should terminate Dr. Lockett-Lewis's employment.

107.   These findings were almost certainly made at the behest of Ms. Itkow, Dr. Coakley, and President Hobbs.

108.   Because Ms. Thornton's investigation was plainly cherry-picked, flawed, and based on fabricated evidence, Dr. Lockett-Lewis submitted a rebuttal thereto.

109.   On December 1, 2025, Ms. Thornton shared the "Final Investigative Report" with Dr. Lockett-Lewis.  Ms. Thornton completely ignored Dr. Lockett-

Lewis's rebuttal and the additional evidence submitted therewith when preparing the "Final Investigative Report."

110.   On December 3, 2025, Dr. Lockett-Lewis submitted an internal grievance against Dr. Coakley to Defendant. Therein, Dr. Lockett-Lewis alleged, among other things, discrimination and retaliation against Dr. Coakley.

111.   On January 28, 2026, more than 10 months after being placed on administrative leave, Dr. Lockett-Lewis was terminated from Defendant by Dr. Coakley. Notably, Dr. Coakley terminated Dr. Lockett-Lewis despite Dr. Lockett-Lewis having filed multiple unaddressed and unresolved grievances against her.

## COUNT I

## RACE DISCRIMINATION, IN VIOLATION OF 42 U.S.C. SECTION 1981

112.   Dr. Lockett-Lewis incorporates Paragraphs 1-111 above as if fully set out herein.

113.   Dr. Lockett-Lewis and Defendant were parties to an employment agreement under which Dr. Lockett-Lewis worked for Defendant and was compensated for her work.

114.   Dr. Lockett-Lewis performed her contractual obligations.

115.   Section 1981 prohibits Defendant from discriminating against Dr. Lockett-Lewis on the basis of race with regard to the making and enforcing of her employment contract with Defendant.

116.    Defendant violated Dr. Lockett-Lewis's rights under Section 1981 on the basis of her race (African American Black) by subjecting her to disparate treatment.

117.    Defendant treated similarly situated Caucasian employees more favorably than her.

118.    As a direct and proximate cause of Defendant's actions, Dr. Lockett-Lewis has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorney's fees and costs, humiliation, and other indignities.

119.    Defendant undertook its actions intentionally and maliciously with respect to Dr. Lockett-Lewis and her federally protected rights, and undertook its conduct recklessly with respect to Dr. Lockett-Lewis and her federally protected rights.

120.    Dr. Lockett-Lewis is entitled to damages against Defendant, including back pay, compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT II

## RETALIATION, IN VIOLATION OF 42 U.S.C. SECTION 1981

121.    Dr. Lockett-Lewis incorporates Paragraphs 1-111 above as if fully set out herein.

122.    Dr. Lockett-Lewis and Defendant were parties to an employment agreement under which Dr. Lockett-Lewis worked for Defendant and was compensated for her work.

123.    Dr. Lockett-Lewis performed her contractual obligations.

124.    Section 1981 prohibits Defendant from retaliating against Dr. Lockett-Lewis on the basis of race with regard to the making and enforcing of her employment contract with Defendant.

125.    Defendant violated Dr. Lockett-Lewis's rights under Section 1981 on the basis of her race (African American Black) by retaliating against for engaging in protected activities including by, among other things, placing her on an indefinite administrative leave, stripping her of her teaching responsibilities, ginning up a sham investigation designed to defame her and besmirch her good name, and terminating her employment.

126.    As a direct and proximate cause of Defendant's actions, Dr. Lockett-Lewis has suffered damages including emotional distress, inconvenience, loss of

income and benefits, out of pocket expenses, attorney's fees and costs, humiliation, and other indignities.

127.   Defendant undertook its actions intentionally and maliciously with respect to Dr. Lockett-Lewis and her federally protected rights, and undertook its conduct recklessly with respect to Dr. Lockett-Lewis and her federally protected rights.

128.   Dr. Lockett-Lewis is entitled to damages against Defendant, including back pay, compensatory damages, punitive damages, attorneys' fees, and costs of litigation pursuant to 42 U.S.C. § 1988, and all other relief recoverable under 42 U.S.C. § 1981.

## COUNT III

## RACE DISCRIMINATION, IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

129.   Dr. Lockett-Lewis incorporates Paragraphs 1-111 above as if fully set out herein.

130.   Dr. Lockett-Lewis is a covered employee for purposes of Title VII.

131.   Defendant is a covered employer for purposes of Title VII.

132.   Dr. Lockett-Lewis, a Black woman, was subjected to disparate treatment based on her race by Defendant, including but not limited to being paid less, being subjected to a sham investigation while other senior leaders were not so investigated despite confirmed misconduct on their parts, being placed on

administrative leave, having her teaching responsibilities stripped from her, and having her employment terminated.

133.    Similarly situated non-Black employees, including Jessica Lindberg, Jeff Brown, Stephanie Loveless, Lisa Jellum, and others, were treated more favorably because of their race.

134.    As a direct and proximate cause of Defendant's actions, Dr. Lockett-Lewis has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorney's fees and costs, humiliation, and other indignities.

135.    Defendant undertook its actions intentionally and maliciously with respect to Dr. Lockett-Lewis and her federally protected rights and undertook its conduct recklessly with respect to Dr. Lockett-Lewis and her federally protected rights.

136.    Dr. Lockett-Lewis is entitled to damages against Defendant, including back pay, compensatory damages, punitive damages, attorneys' fees, and costs of litigation.

## COUNT IV

## RETALIATION BASED ON RACE, IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

137.    Dr. Lockett-Lewis incorporates Paragraphs 1-111 above as if fully set out herein.

138.  Dr. Lockett-Lewis is a covered employee protected by Title VII.

139.  Defendant is a covered employer subject to Title VII's requirements.

140.  Title VII prohibits Defendant from retaliating against Dr. Lockett-Lewis on the basis of race with respect to terms and conditions of employment.

141.  Defendant violated Dr. Lockett-Lewis's rights under Title VII on the basis of her race (African American Black) by retaliating her for engaging in protected activities including by, among other things, placing her on an indefinite administrative leave, stripping her of her teaching responsibilities, ginning up a sham investigation designed to defame her and besmirch her good name, and terminating her employment.

142.  As a direct and proximate cause of Defendant's actions, Dr. Lockett-Lewis has suffered damages including emotional distress, inconvenience, loss of income and benefits, out of pocket expenses, attorney's fees and costs, humiliation, and other indignities.

143.  Defendant undertook its actions intentionally and maliciously with respect to Dr. Lockett-Lewis and her federally protected rights and undertook its conduct recklessly with respect to Dr. Lockett-Lewis and her federally protected rights.

144.    Dr. Lockett-Lewis is entitled to damages against Defendant, including back pay, compensatory damages, punitive damages, attorneys' fees, and costs of litigation.

## COUNT V

### RETALIATION, IN VIOLATION OF THE GEORGIA FAIR EMPLOYMENT PRACTICES ACT O.C.G.A. §§ 45-19-29 et seq.

145.    Dr. Lockett-Lewis incorporates Paragraphs 1-111 above as if fully set out herein.

146.    Dr. Lockett-Lewis is covered by the protections of the GFEPA.

147.    GHC and the Board of Regents are Dr. Lockett-Lewis's employer and are subject to GFEPA's requirements, including the statute's prohibition against retaliation.

148.    Dr. Lockett-Lewis repeatedly engaged in statutorily protected activity under the GFEPA, including when she reported Dean Lindberg's comments to Ms. Itkow, as well as when she met with Ms. Itkow and Dean Lindberg, reported her concerns to the USG ethics line, filed Charges of Discrimination with the GCEO and EEOC, and complained about disparate treatment, retaliation, harassment, and unequal pay based on race.

149.    GHC, in turn, retaliated against Dr. Lockett-Lewis by, among other things, 1) placing her on an indefinite administrative leave; 2) stripping her of her

teaching roles; 3) ginning up a sham investigation into previously undisclosed and fabricated instances of purported misconduct; and 4) terminating her employment.

150.    The above-pleaded conduct toward Dr. Lockett-Lewis constitutes unlawful retaliation, in violation of the Georgia FEPA.

151.    As a direct and proximate result of GHC's unlawful actions, Dr. Lockett-Lewis has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

152.    GHC's actions were willful, wanton, and intentionally directed to harm Dr. Lockett-Lewis.

153.    GHC's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

154.    Dr. Lockett-Lewis is entitled to an award of back pay and benefits, and other relief available under the Georgia FEPA.

## COUNT VI

## WHISTLEBLOWER RETALIATION, IN VIOLATION OF THE GEORGIA WHISTLEBLOWER ACT O.C.G.A. §§ 45-1-4 *et seq*.

155.    Dr. Lockett-Lewis incorporates Paragraphs 1-111 above as if fully set out herein.

156.    Dr. Lockett-Lewis is an employee covered by the protections of the Georgia Whistleblower Act.

157.   GHC and the Board of Regents are employers subject to the requirements of the Georgia Whistleblower Act because they are public employers and receive state funds.

158.   Dr. Lockett-Lewis engaged in statutorily protected activity under the Georgia Whistleblower Act, including when she reported Dean Lindberg's comments to Ms. Itkow, as well as when she met with Ms. Itkow and Dean Lindberg, reported her concerns to the USG ethics line, filed Charges of Discrimination with the GCEO and EEOC, and complained about disparate treatment, retaliation, harassment, and unequal pay based on race.

159.   GHC, in turn, retaliated against Dr. Lockett-Lewis by, among other things, 1) placing her on an indefinite administrative leave; 2) stripping her of her teaching roles; 3) ginning up a sham investigation into previously undisclosed and fabricated instances of purported misconduct; and 4) terminating her employment.

160.   The above-pleaded conduct toward Dr. Lockett-Lewis constitutes unlawful retaliation, in violation of the Georgia Whistleblower Act.

161.   As a direct and proximate result of GHC's unlawful actions, Dr. Lockett-Lewis has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

162.   GHC's actions were willful, wanton, and intentionally directed to harm Dr. Lockett-Lewis.

163.   GHC's actions were reckless and were taken in willful disregard of the probable consequences of its actions.

164.   Dr. Lockett-Lewis is entitled to an award of back pay and benefits, front pay, injunctive relief, compensatory damages, punitive damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under the Georgia Whistleblower Act.

**WHEREFORE,** Dr. Lockett-Lewis demands a TRIAL BY JURY and the following relief:

a.   declare that Defendant has violated Dr. Lockett-Lewis's rights under the federal and state statutes listed above;

b.   permanently enjoin Defendant from violating, presently and in the future, Dr. Lockett-Lewis's rights under the federal and state statutes listed above;

c.   award Dr. Lockett-Lewis full backpay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

d.   award Dr. Lockett-Lewis prejudgment interest as required by law;

e.   award Dr. Lockett-Lewis compensatory damages for emotional pain and suffering in an amount to be determined by the enlightened conscience of a jury;

f.   award Dr. Lockett-Lewis front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

g.    award Dr. Lockett-Lewis punitive damages against Defendant sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future, as determined by the enlightened conscience of a jury;

i.    award Dr. Lockett-Lewis reasonable attorneys' fees and expenses; and

j.    grant such additional relief as may be just and proper.

Respectfully submitted, this 9th day of March, 2026.

*/s/ Cary R. Burke*
Cary Burke
Georgia Bar No. 757627
LEE MEIER BURKE, LLC
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 474-7628
cburke@leemeier.law

**COUNSEL FOR PLAINTIFF**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| DR. MICHELLE LOCKETT-LEWIS, | ) | |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | Civil Action No.: 4:25-cv-00310-WMR |
| | ) | |
| BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA AND GEORGIA HIGHLANDS COLLEGE, | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | | |

## <u>CERTIFICATE OF SERVICE</u>

On March 9, 2026, I filed the aforementioned FIRST AMENDED COMPLAINT via the Court's e-filing system, which will serve copies of the same on all counsel of record.

*/s/ Cary R. Burke*
Counsel for Plaintiff
